Next argument this morning when council is ready will be 21-8042 Ranchers Cattlemen v. USDA. And Council Gordon, you can make your appearance and proceed. Pardon me? You can make your appearance and proceed. Yes, thank you. Harriet Hageman on behalf of the appellants, RCAF, Tracy and Donna Hunt, and Kenny and Roxy Fox. May it please the court. I'd like to reserve three minutes for rebuttal. And I'd just like to say that there's a certain poetic justice to the timing of these arguments being immediately on the heels of National Sunshine Week, which ended on March 19th and marks the week of James Madison's birth 271 years ago. It was Madison who said that knowledge will forever govern ignorance and a people who mean to be their own governors must arm themselves with the power knowledge gives. And that very succinctly is why we have what we call sunshine loss. We cannot engage in self-governance if we don't know what the government is doing or who is influencing or controlling the levers of power. Sunshine Week is a national initiative focused on the importance of open government and the dangers of unnecessary secrecy while highlighting the importance of government transparency. And Congress has adopted a variety of sunshine policies, including the Federal Advisory Committee Act, the purpose of which is to make sure that the public is informed about what agencies are doing, what kind of committees they are working with, and the purpose and membership and activities of those committees. This is to avoid having one industry group or big business control government to their own ends and to avoid industry capture. To ensure that when the government agencies seek the advice and counsel of outside groups to establish federal policy, there is fair representation and balance related to the issues at hand. There are not a lot of tools that are available to hold agencies accountable to the public that they are allegedly in the business to serve. But FACA is one of those tools. And any effort to interpret it out of existence should be met with strong resistance. If I can just cut in a little bit. On this question of established, which of course is one element on the point of whether it's an advisory committee, if we were to adopt a narrow reading of established along the lines of, I believe, a public citizen case, is there any chance of you prevailing under such a reading? Well, first, Your Honor, public citizen did not narrowly construe the word established. I realize that. That's not that. I'm using that as a guidepost. I understand that from the briefs, that it did not construe that, that it construed utilized. But I'm asking you, there are cases that have used that as sort of a guidepost and essentially a signaling, giving a signaling effect that such a narrow reading should apply to established. And I'm asking you just the question, is there an argument that you have that would allow you to prevail even under such a narrow reading of established? Absolutely, Your Honor. These committees were purpose-built committees and they were purpose-built for one reason. And that was to assist the USDA and advise the USDA and its sub-agency APHIS as to how to move forward with an RFID mandate to require all livestock producers in the United States to use RFID technology. So you would conclude that both the working group and the council were actually formed by the federal agency? I think that the record is very clear that they were, Your Honor. When you look at, you look at the purpose of these committees. Even though they were, I thought, industry-driven? No, industry-driven. And industry-funded? Weren't they funded? Every meeting was funded by the industry, not by the federal government? Did you say funded? Funded. Okay, that isn't a requirement under FACA that it be funded by the government? No, just an idea out there that might support whether or not it's established by the government. We don't know who funded these committees. That's part of the reason why we need a discovery, Your Honor, because there isn't information in the record that would answer that question. Well, you had, what, four months to request that discovery and you didn't do it. You knew that it was going to proceed under the administrative record and there was no objection made to doing that, right? No, Your Honor, I would disagree with that as well. Please. We did not, we didn't receive the administrative record until July of 2020. And at that time, we didn't know what the administrative record was going to show. Well, how does that answer the question? I mean, they had voked the rule, the local rule. They said, we're going to proceed, we want to proceed under the administrative record. Why do you have to wait to see the administrative record to know whether you may want additional information? Because, Your Honor, we didn't know what that administrative record was going to show. We didn't know what the documents were going to be and whether they would demonstrate why they didn't comply with FACA. We met all of the deadlines. We met every single deadline that was imposed by the court in terms of seeking discovery or seeking to supplement that record. And, in fact, the district court did not deny our request for discovery based upon a timeliness issue. The district court concluded that discovery was not available under FACA. Wait a minute. Unless I'm reading a different case, there was a magistrate judge ruling and a district court ruling. They both went out on timeliness. They may have talked about other things, but that was one ground, was it not? The magistrate judge, I would agree with you. But as far as the district court judge, she actually addressed the substance of the question of whether we were entitled to discovery. And her conclusion was based upon her reading of FACA that discovery was not allowed under FACA. Well, I'll go back and look at that. Let me ask you a question about established as it relates to essentially how the case law has interpreted that. Are you aware of a case under FACA where the government entity has been deemed to have established the agency without appointing its members? Because as I understand it here, there has been no government appointment of any member of these two entities. And I don't believe that FACA requires that to establish. I don't think that answered my question. My question was that in the cases, there tends to be an emphasis on whether the agency appointed the members and determining whether it established that entity. And my point is, since we don't have that situation here, are there any cases that would support your position affirmatively by saying you can still establish an agency without appointing the members? That you can still establish an advisory committee? Yes, an advisory committee. I believe that public citizen absolutely says that, Your Honor. I thought you were telling me public citizen doesn't have anything to do with established and it relates to utilized. It describes the use of the word established and that it is to be interpreted broadly. It is not to be interpreted narrowly. There is a difference between established and utilized. And when public citizens was looking at the question of established, they went directly to the legislative history and talked about the fact that it should be interpreted in its most liberal sense. So that when an officer brings together a group by formal or informal means, by contract or other arrangement, and whether or not federal money is expended to obtain advice and information, such group is covered by the provisions of the statute. I take it now you're telling me that public citizen does speak to the established question. You told me at the beginning it did not. No, I think that I must have misspoke, Your Honor, because what I said is that public citizen absolutely supports our position in terms of whether these two advisory committees were established by the USDA. Well, when public citizen interprets utilized narrowly, it doesn't help you, right? And in that sense, public citizen doesn't speak to this situation. I believe that public citizen even interpreting utilized narrowly in this particular circumstance doesn't prevent us from finding that these were both advisory committees. But is the answer to my question, the direct question I ask you, whether you had a case in which there was an established bond, that being the finding in which the government agency did not appoint the members, whether you had such a case, I take it the answer is no. The answer is no, Your Honor. All right. And that's where I would go back to is, again, but for the USDA establishing the CTWG and the PTC, they wouldn't exist. And but for the CTWG and the PTC being brought into existence and being formed by the USDA, there wouldn't have been an RFID mandate. Okay, formed? How'd they form them? How did this all happen? Well, I can read to you directly from what the district court said. They brought these groups together. They were participants in the September 2017 meeting. They described all of the reasons as to why RFID was necessary. They explained to them why they wanted to work with these producer groups and these various entities. And they created the working group and the council, is what you're saying? They absolutely formed, they absolutely created the CTWG. Or did they just suggest we need to get this done? Your Honor, I think that it is form over function, and it's the reason as to why I started out my discussion with the Sunshine Laws. We should not be interpreting these words out of existence so that FACA has absolutely no teeth whatsoever. We have a lot of D.C. Circuit case law in this area. And there's a case called Byrd v. EPA, and it held established means actually formed. And I disagree, and many of the decisions subsequent to Byrd disagree with that finding as well. D.C. Circuit cases? Yes, and it's an outlier decision from a sharply divided D.C. Circuit panel, but the majority reached its narrow construction based solely on its misreading of public citizen. And if you go back and you look at the… Okay, what case are you relying on? In the Byrd v. U.S. EPA, the case that you just referenced that is an outlier decision. As explained in the public citizen case, again, they interpreted established much broader. And Byrd narrowed that, but it was their misreading of the public citizen decision. I believe that Byrd was wrongfully decided. In the language you were reading, what was that, the dissent of Byrd, or what was that? It is that in the post-public citizen, we see the AAPS case, the Miccosukee Tribe of Indians v. Everglades Restoration Alliance case. And those cases, they disagreed with the finding in the Byrd. The other thing that I think is very important is if you look at Appley's brief in terms of their analysis of Byrd, they make it appear that that is a public citizen analysis. But if you look at that, that isn't. So what I'm saying is that if FACA is going to have any teeth whatsoever, it absolutely would have to apply to the type of purpose-built committees that we are dealing with here. Let me ask you this question. And this relates to one argument that you have about whether even there needed to be compliance with the APA. In other words, even if the agency decided that FACA did not apply, that they needed to offer some explanation for why it didn't apply. Let's assume that's true. How were you harmed by the agency not doing that? I mean, can you reasonably say that the agency would not have reached the same decision if it had explained that decision? Well, Your Honor, in part because what we're trying to do is we're trying to address the fact that in violating FACA and putting together the information that they have, this supports their decision for a mandatory RFID requirement for virtually all livestock producers in the United States with a price tag of well over $2 billion. The agencies are continuing to move forward with that same agenda. In fact, they issued a notice of proposed rulemaking earlier this month seeking to go forward with an RFID requirement against our livestock producers. I did not answer my question. My question is pretty clear. In the administrative law context, as with other contexts, there is a principle of harmless error. And the point here would be, let's assume that there was an obligation to explain why they didn't apply FACA. How were you harmed by that? Is there any reasonable probability that they wouldn't have done the same thing if they had explained it? Obviously, they've done it here and they've taken the position that FACA does not apply. What basis is there to believe that they wouldn't have reached the same decision? Because it's what I said earlier. Without the CTWG and the PTC, they couldn't go forward with an RFID requirement. The harm is what they are attempting to do to all of the livestock producers in the United States with the harm of well over $2 billion in cost if they move forward with the RFID. The harm is that the USDA is attempting to move forward with requiring all livestock producers to use RFID technology and register their ranches with the federal government based upon work and activities from two advisory committees that were illegally formed under FACA. Okay, my argument, not my argument, but going back to the question. If they had explained that we're not going to view these as advisory committees under FACA, would you have been able to, is there any reason to believe you would have been able to show that that was an arbitrary and capricious connection of the end with the reason that we're doing what we're doing? APA is self-effectuating in the sense that that is what they're required to show. And if they don't do that, they violated the APA. Well, there's also a harmless error doctrine under the APA. And my point to you, which I won't belabor anymore, but my point to you is if you can't show that they wouldn't have done the same thing anyway, then you weren't harmed. Now, you can challenge that later, but the point is they would have done the same thing. It goes back to the same argument that I've been making throughout this, that whether they would have done the same thing, the question becomes, did they follow the law, either the APA or FACA, in putting together these committees and taking the advice from them and pursuing an RFID requirement against all livestock producers? The harm is in the regulations that they are adopting and enforcing against my clients. That is the harm. What they would have explained in terms of not complying with FACA, that would have been additional information for us to know, again, what to challenge, what kinds of claims to bring against them. By basically circumventing FACA, they have done exactly the situation that I'm standing here before you right now with everybody saying, You're standing here over time. We'll see how the other argument plays out, and we'll see if we're better at that point. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. Sean Janda for the federal government. I'd like to begin by taking a little bit of a step back to help situate this case in context. Animal disease traceability is an extremely important issue, both to the Department of Agriculture and to a number of other third parties, including state, local, and tribal partners and industry stakeholders. An effective disease traceability program is required to allow the effective and quick containment in the event of any disease outbreak, but at the same time imposes costs, both logistical costs and financial costs, on a number of parties, including industry stakeholders. For that reason, when the department began considering whether to amend its 2013 regulations, it wanted to reach out to those parties who would be affected by any regulatory change and hear their input before deciding what to do. So it held a number of public meetings. It solicited comments. It convened a state-federal working group that held additional meetings and reviewed the feedback they had received. And that state-federal working group made a number of recommendations to the agency. One of them was that the agency should move forward on this electronic identification requirement. And following those recommendations- Were all the members of the working group industry? So the state-federal working group, Your Honor, I apologize for not being clear, is not at issue in this case. That was a state-federal partnership. Right, right. But the members of the- The working group at issue here. The working group at issue. The Cattle Traceability Working Group, my understanding is every member was an industry or I think there might have been some state government members. There were no federal members of the committee, to my knowledge, and there are a number of meeting minutes in the record that list the members who were present. And those meeting minutes generally do not list agency members. And then the Producer Traceability Council, which is the second group at issue, I think there is some discussion in the record about whether one agency member was a non-voting member or a government liaison or an informational resource. I don't think the difference matters all that much. Who was that? I believe her name was Dr. Sarah Tomlinson. And she specifically said she didn't want to be a member, right? Correct, correct. And non-voting? Yes. Right, so I believe she described herself maybe as a liaison. I think she's described elsewhere as a non-voting member. It's clear that she didn't vote, and she says repeatedly in the record that her role was to provide information, to answer questions, to allow the industry members of the committee to have an informed discussion and make an informed recommendation. That being said, I think whether she was technically a non-voting member or not a non-voting member isn't that relevant. As to either FACCPROM, with respect to establishment, as we explained in our brief, the cases are uniform. That establishment requires that the agency actually select members of the committee. I think BIRD and Food Chemical News are very, very helpful comparators on this point. They both make clear, in cases even where the agency had contracted with an outside contractor to put together a panel, it certainly conceived of the need for the panel. Are there any circuit cases? I'm not aware of any, but maybe you can point me to some that suggest otherwise. The D.C. circuit cases are BIRD and the VET. BIRD and Food Chemical News, I think, are the two most on point on this point. What about VoteVets? VoteVets is a more recent case. My understanding of VoteVets is that the question, the latest issue in the case, dealt more with the extent to which the group was sufficiently organized to constitute a committee, not who had appointed the members of the committee. Organized as in the utilize prong of advisory committee? No, I mean, organized as sort of a precursor first step, which is that FACCPROM only applies to committees, not to people who are being consulted as individuals. Even if you put three individuals in a room and you ask each of them their views, to the extent that they're not organized and structured as a committee, FACCPR wouldn't apply at all. And whether organized is, in some sense, on the continuum to establish is what you're saying, that in that case that was the question, whether the level of organization would be tantamount to established? No, Your Honor. My understanding of that case is that it just dealt with a separate question, which is sort of this precursor question. There's not a lot in your brief on the, granted it was a large issue, but on the question of whether there would nevertheless be any APA obligations by the agency in deciding that these two entities were not covered by FACA. In fact, I mean, you cite Bennett v. Speer and give language from it and pretty much leave it at that. I mean, what's the position on that, on whether, and I'll ask two questions. One, whether what went on here could be conceivable final agency action. I mean, and what indicators would be associated with the question of whether it would be final agency action? And I guess the question is, even if it is final agency action, is there some argument that they would be harmed by not, by your failure to comply? Right, Your Honor. So I'll take the second question first. And I think it's clear that to the extent that the committees were not in fact, the groups were not in fact established or organized or utilized by the agency, then there can't be any harm to the plaintiffs from the government's failure to break that down. The working group came together and discussions were had, and then apparently it was an impasse. But yet, after those initial meetings and the impasse, didn't USDA sort of start reporting that there's some consensus and the consensus has increased for livestock ID? So I'm not sure, Your Honor. I mean, I think it's certainly clear that there was sort of... There was nothing there, but they made something of it, is my point. I don't think that's correct, Your Honor. I mean, I think sort of from the very beginning, from the state federal working group that preceded these groups, the recommendation from that group was that there was a wild movement toward electronic identification requirements, and the recommendation was that the agency also move toward that. I think it's clear that there was sort of people who were not content, industry representatives who were on the working group who were not content with kind of the slow pace or what they perceived to be the slow pace of the working group, and so these industry representatives decided that they wanted to form a smaller group that consisted just of producers that they thought would... Well, the council, that's the smaller group? Correct, Your Honor. And the smaller group did not involve anybody that was opposed to ID? I'm not sure, Your Honor, what sort of the individual views of each person on that council were. Isn't that represented in our case as true? I think it's... So I'm not sure, Your Honor, and I think the agency sort of wasn't selecting the members. The agency certainly didn't interview the members to ask them what their sort of individual personal views were. So this just sort of grew of its own volition? The industry, the livestock industry, moved through these steps on its own without any push or influence by USDA? So I don't want to overstate the case, Your Honor. I think it's certainly clear from the record that the agency was sort of in communication with these groups. I think it's clear that the groups understood that the agency would find it helpful to have industry stakeholders' views before it moved forward. That being said... Is it also clear to these groups that USDA really wanted the ID program to happen? Again, I'm not sure exactly what I can say about or what one could say about what the agency wants. It's certainly true that the recommendation of the state federal working group was that the agency move toward this, and the agency has sort of since issued a notice in 2020 relating to this, but then stated that any future rulemaking would be by rulemaking, would be by notice and comment rulemaking, and the agency isn't going to impose any sort of electronic requirements, identification requirements, without going through notice and comment rulemaking. But that being said, what the record demonstrates is that it was industry representatives on the working group who were dissatisfied with the way the working group was going, and they were the ones who decided to form a new council. They were the ones who appointed or invited members to that council. They were the ones who sort of organized and ran that council. Let's assume that the agency, and whether or not that this is facts, the facts here, let's assume the agency says, based upon the state working group, that industry working group, we now think provisionally, tentatively, this seems like a reasonable idea. We don't want to fashion a rule before we find out what affected parties think about that rule. And since we think it's a good idea, we're going to reach out to some people and say, help us understand what would be the upside, downside, because we're moving in this direction tentatively. Help us to understand what would be the upside, downside of what we're doing for you people on the ground. Would there be any FACA problem with that? No, I don't think so, Your Honor. I mean, I think that's what the Supreme Court makes very clear in public citizen, which is that it's not sort of this nefarious thing for the government to try and engage with constituents and with those who are affected by policy to determine how to move forward on policy. That's sort of basic good governance. And to the extent that the agency is not sort of strictly managing or strictly controlling some outside group in the way that is discussed in public citizen, that sort of consultation, that sort of airing of views, that sort of trying to understand what affected stakeholders think is not subject to FACA. And see, the premise of my question is that the agency really did have a tentative direction it was aiming. In other words, you can have people on the outside saying, I don't want to do this ID thing, period. And in some ways, if the agency says tentatively, I'm moving in this direction, so if I'm going to have people who are constantly saying, well, I want to go the other direction, that dialogue really is not helping me to move to a point where I'm informed on the universe of factors associated with my tentative direction. So one could argue that they're excluding voices in that. So with that sort of configuration of things, is there still some problem? I mean, because ultimately, the agency has to do a final rule anyway, which the outside voices can lob bombs then, right? Right. I think that's exactly right, Your Honor. And I think FACA serves an important purpose, but it's not sort of the only law that constrains agency decision-making. And the APA requires an agency before it passes a legislative rule generally to open that up for public comment. And any member of the public can comment, and any member of the public can bring a challenge to a final rule that affects them if they think that their views weren't adequately heard and considered in that rulemaking process. And there's no obligation on the front end for the agency to reach out to sort of a balanced spectrum of people. Well, it is if FACA applies. Don't they have to have a balanced, fair group? Correct, Your Honor. If the agency is utilizing or establishing a committee under FACA, there is a fair balance requirement. But just generally speaking, when an agency is choosing to engage with stakeholders, there's no similar requirement that FACA doesn't apply. Getting back to my question, though, earlier, what's your strongest argument for why this is not final agency action? So I think the strongest argument, Your Honor, is just that the receipt of, whether it's documents or information or advice from a stakeholder, doesn't affect anyone's rights or obligations, which is the hallmark of final agency action. And that's true in this context just as true as it is any time an agency or the executive reaches out to a third party to consult with them or to get advice. I think under Plante's view, there would be an APA problem with, I mean, to use the examples of the Supreme Court using public citizen, when the executive reaches out to the NAACP for their advice on EEOC nomination, or when the president or, say, the Secretary of Defense, who's subject to the APA, is visiting an American Legion post and he asks for their views on policy. I mean, these are the sorts of things that there's no, affecting anyone's rights or obligations, there's no final policy change. And to get to that point, in some sense, could one view this as being like on a continuum? I mean, you have this sort of information gathering phase, and then you have the actual act of passing some sort of binding federal rule. On that end, you are affecting rights and obligations. Here the question is, I'm just gathering stuff. Right. I think that's exactly right, Your Honor. And, again, to the extent that the Plante's here, other third parties, think that the information that the agency received from these groups or the feedback that they've gotten from other stakeholders is bad information or is incorrect information, and then the agency tries to rely on that information, they'll have the chance to submit comments, they'll have the chance to challenge that. Once the agency actually passes a rule, if they do pass a rule in the future, that goes through all those procedural requirements, that actually affects them. But that hasn't happened yet, that isn't at stake in this case, and I think that's sort of where those challenges are properly brought. If there are no further questions, we'll ask this Court to affirm the district. Thank you. 40 seconds on the rebuttal. 40. Thank you, Your Honor. Three quick points. First of all, the 2013 rule already provides for animal ID and traceability. The purpose of the CTWG and the PTC was for the USDA and APHIS to try to find a way to circumvent that rule and come up with an RFID mandate without having to modify the rule and go through the rulemaking process. Whoa, whoa, whoa, whoa. Wouldn't they have to ultimately go through a rulemaking process even to modify a rule? That isn't what they did. That's why they issued the 2019 fact sheet. That was the basis of the underlying lawsuit that we've sued over. That was the whole lawsuit that we sued over. We sued over that, and they withdrew that fact sheet because the fact sheet was designed to undermine and circumvent the 2013 regulation that already existed. That's why FACA is so important here, because they put these groups together for the very purpose of trying to find a way around the 2013 rule that already provides for animal ID and traceability. All right. You only got to one, and we're going to have to time. Okay. Okay. I appreciate it very much. Thank you. Thank you for your fine arguments. Case is submitted.